1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VIRAG, S.R.L., et al.,

        Plaintiffs,

    v.

SONY COMPUTER ENTERTAINMENT
AMERICA LLC, et al.,

        Defendants.

Case No. 3:15-cv-01729-LB

**ORDER GRANTING IN PART AND
DENYING IN PART THE
DEFENDANTS' MOTION TO DISMISS**

[Re: ECF No. 59]

### INTRODUCTION

    VIRAG, S.R.L. ("VIRAG") is an Italian company in the commercial flooring business. (First Amended Complaint ("FAC"), ECF No. 57 ¶¶ 1, 11.[1]) Mirco Virag is an Italian resident and one of VIRAG's owners. (*Id.* ¶ 2.) He has on multiple occasions driven a VIRAG-sponsored car in the Rally of Monza race. (*Id.*) VIRAG sued the defendants Sony Computer Entertainment America LLC ("Sony America") and Sony Computer Entertainment, Inc. ("Sony, Inc.") for violating its common law right of publicity and its trademark rights under the Lanham Act, and Mirco Virag sued the defendants for violating his common law right of publicity, because the defendants included VIRAG's trademark, which appears on a bridge over the track on which the Rally of Monza occurs, in their racing video games, Gran Turismo 5 and Gran Turismo 6. (*Id.* ¶¶ 3-4, 12-18, 41-66.) The defendants filed a motion to dismiss the plaintiffs' First Amended Complaint,

---

[1] Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the tops of the documents.

which the court grants in part and denies in part. The court dismisses with prejudice VIRAG's

claims (claims one, two, and three). Mirco Virag's claim (claim four) survives.

STATEMENT

**I. THE ALLEGATIONS IN THE FIRST AMENDED COMPLAINT**

    **A. VIRAG, Mirco Virag, and the VIRAG® Mark**

    VIRAG was founded in the 1960s as a carpet distributor, and it later expanded into the field of

commercial flooring for offices, hospitals, sports facilities, and warehouses. (FAC, ECF No. 57 ¶

11.) It now has more than 2,500 sales outlets and 40 sales agents to service the Italian and

European commercial flooring markets and, more recently, the North American market. (*Id.*)

VIRAG is strongly committed to the export market, with showrooms, staff, and production

agreements with some of the most important floor manufacturing partners throughout the world.

(*Id.*)

    Through its efforts, VIRAG has become a recognized leader in flooring products, and its

VIRAG® mark has become well-known in the flooring industry. (*Id.* ¶ 11.) The VIRAG® mark is

a distinctive mark and is registered with the U.S. Patent and Trademark Office as Reg. No.

4,427,060. (*Id.* ¶ 12 & Ex. 1.) VIRAG also registered the "e Evolution VIRAG" trademark with

the U.S. Patent and Trademark Office as Reg. No. 3,462,406. (*Id.* & Ex. 2.)

    Beginning in 2004, VIRAG agreed to sponsor the Rally of Monza at the Autodromo Nazionale

Monza (the "Monza Track"), a racetrack located in Monza, Italy, where the Formula One Italian

Grand Prix has been held since 1948. (*Id.* ¶ 13.) As part of the sponsorship, in 2006 VIRAG's

name and trademark began being displayed on a bridge over the Monza track for each Rally of

Monza race. (*Id.*) Through its sponsorship at the Monza Track, according to the plaintiffs, the

VIRAG® mark has become affiliated with the Rally of Monza and the Monza Track in the minds

of the public. (*Id.* ¶ 14.)

    In addition, one of VIRAG's owners, Mirco Virag, is a professional racing driver on the

European Rally Circuit. (*Id.* ¶¶ 2, 19.) Since his 2001 debut in rally racing, Mirco Virag obtained

remarkable success on the European Rally Circuit, with racing victories at Trofeo ACI Como

(2011), Rally Ronde del Ticino (2011), Rally Ronde del Ticino (2010), Rally della Valcavargna

United States District Court
Northern District of California

2

(2008), Ronde della Val d'Aveto (2007), and Rally Autodromo di Franciacorta (2007), becoming one of the premier drivers on the European Rally Circuit. (*Id.* ¶ 19.) He also has competed in the Rally of Monza, and VIRAG has sponsored a car for him. (*Id.* ¶ 13.) In the international racing world, the VIRAG® mark has become a "personification" of Mirco Virag. (*Id.* ¶¶ 13, 19.)

VIRAG has consciously and discreetly used the VIRAG racing connection in targeted marketing towards its customer base, including distributors, installers, and builders. (*Id.* ¶ 37.) When marketing its tile products, VIRAG sends event invitations to clients capitalizing on Mirco Virag and his racing team's successes. (*Id.* ¶ 20.) Over several years, capitalizing upon the duality of Mirco Virag's management of VIRAG and his participation in road rallies, VIRAG photographed, published, and distributed limited editions of VIRAG's racing book VIRAG Vincenti Sempre ("VIRAG Always Winning") to select clients, architects, and builders. (*Id.* ¶ 21; *see also id.* (alleging that VIRAG's racing book states that Mirco Virag "has always made an excellent job of everything: with his car, the equipment, tools and men, to the highest degree, thus creating a really good team, and a consequent gain of image for the VIRAG Floors").)

**B. THE GRAN TURISMO GAMES**

Since 1998, the defendants developed, produced, and/or distributed a series of race car driving simulation games under the name "Gran Turismo" for use in their game system, the Sony PlayStation. (*Id.* ¶¶ 15, 23.) Over 70 million copies of the Gran Turismo games have been sold. (*Id.* ¶¶ 15, 24.)

In December 2010, the defendants released Gran Turismo 5, which included a simulated version of the Monza Track. (*Id.* ¶ 15.) In the course of designing Gran Turismo 5, the defendants willfully and intentionally chose to include the VIRAG® mark on a simulation of the bridge from the Monza Track. (*Id.* ¶¶ 16, 25.) Sony America distributed the Gran Turismo 5 game globally, including throughout the United States and North America, and to date over 10.89 million copies have been sold. (*Id.* ¶¶ 26, 27.)

The defendants' unauthorized use and display of the VIRAG® mark continued in Gran Turismo 6, which was released in December 2013. (*Id.* ¶¶ 16, 28.) To date, over 2.37 million copies of Gran Turismo 6 have been sold. (*Id.* ¶ 28.)

United States District Court
Northern District of California

United States District Court
Northern District of California

The plaintiffs allege that the defendants' use of the VIRAG® mark in Gran Turismo 5 and Gran Turismo 6 is not artistically relevant to the games or incidental.[2] (*Id.* ¶¶ 34, 54, 58.) The VIRAG® mark has developed significant recognition in the European and world-wide racing world and is directly connected to the purpose, or subject, of the Gran Turismo games, which claim to simulate car racing in Europe. (*Id.* ¶ 35.) The VIRAG® mark is prominently displayed in the Monza Track level in the games. (*Id.* ¶ 36.) According to the plaintiffs, the defendants' use of the VIRAG® mark in Gran Turismo 5 and Gran Turismo 6 has caused, and is likely to cause, confusion regarding VIRAG's sponsorship or approval of the games, or its provision of expertise and knowledge for the games, none of which has been given. (*Id.* ¶¶ 29-30.)

VIRAG carefully controls the use of the VIRAG® mark to insure that VIRAG is not associated with any companies or products that would adversely impact VIRAG's reputation among its customers and the buying public. (*Id.* ¶ 22.) VIRAG and Mirco Virag have always denied requests to sponsor products through use of the VIRAG® mark and Mirco Virag's racing persona. (*Id.* ¶ 39.) VIRAG has no reason to advertise in a Sony video game because such games, including Gran Turismo 5 and Gran Turismo 6, do not realistically portray a true racing experience. (*Id.* ¶ 38.) VIRAG and Mirco Virag have received negative feedback from VIRAG customers regarding the appearance of the VIRAG® mark in Gran Turismo 5 and Gran Turismo 6. (*Id.* ¶ 40.)

The defendants did not seek nor obtain VIRAG's permission to display the VIRAG® mark, or Mirco Virag's permission to use his identity, in either Gran Turismo 5 or Gran Turismo 6. (*Id.* ¶ 17.) Indeed, the defendants specifically chose to exclude from Gran Turismo 5 and Gran Turismo 6 certain other marks that appeared at the Monza Track, but they intentionally and without

---

[2] "As a general rule, [a district court] 'may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" *United States v. Corinthian Colleges*, 655 F.3d 984, 998-99 (9th Cir. 2011) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)). The incorporation-by-reference doctrine is an exception to this general rule, *see Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005), and the parties do not dispute that the court properly can consider Gran Turismo 5 and Gran Turismo 6 in their entirety because they have been incorporated by reference into the plaintiffs' First Amended Complaint, *see Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1248 n.7 (9th Cir. 2013) (citing *Knievel*, 393 F.3d at 1076).

authorization chose to incorporate the VIRAG® mark to create a false impression of sponsorship or authorization. (*Id.* ¶ 31.) Additionally, the defendants obtained licenses or authorization from other trademark holders to use their marks in Gran Turismo 5 and Gran Turismo 6, but the defendants did not obtain a license or authorization from VIRAG or Mirco Virag. (*Id.* ¶ 32.) The plaintiffs allege that the defendants did this to mislead consumers as to sponsorship or authorization regarding their use of the VIRAG® mark. (*Id.* ¶ 33.) The plaintiffs also allege that, as a result of the defendants' appropriation of VIRAG's and Mirco Virag's identity and name, use of the VIRAG® mark, and characterization of Gran Turismo 5 and Gran Turismo 6 as "real driving simulator[s]," the defendants have received millions of dollars in revenue. (*Id.* ¶¶ 44, 64.)

## III. PROCEDURAL HISTORY

The plaintiffs filed their Original Complaint on July 31, 2014, in the United States District Court for the District of New Jersey. (Original Complaint, ECF No. 1.) In November 2014, the defendants filed a motion to dismiss the Original Complaint and a motion to transfer the action to the United States District Court for the Northern of District of California. (First Motion to Dismiss Original Complaint, ECF No. 26; Motion to Transfer, ECF No. 28.) After both motions were fully briefed, the New Jersey district court granted the motion to transfer and did not rule on the motion to dismiss. (Opinion, ECF No. 34; Order Transferring Action, ECF No. 35.)

On May 20, 2015, after the action was transferred, the defendants filed a new motion to dismiss the Original Complaint. (Second Motion to Dismiss Original Complaint, ECF No. 49). On June 1, 2015, the plaintiffs filed their First Amended Complaint as a matter of right, which mooted the motion. (FAC, ECF No. 57.) In it, the plaintiffs bring four claims. (*Id.* ¶ 41-66.) In the first three claims, the plaintiffs allege, respectively, that the defendants violated VIRAG's common-law right of publicity, violated 15 U.S.C. § 1114 by infringing the VIRAG® mark, and violated 15 U.S.C. § 1125(a) by falsely designating the origin of Gran Turismo 5 and Gran Turismo 6. (*Id.* ¶¶ 41-60.) In the fourth claim, the plaintiffs allege that the defendants violated Mirco Virag's common-law right of publicity. (*Id.* ¶¶ 61-66.)

The defendants filed a motion to dismiss the First Amended Complaint. (Motion, ECF No. 59.) The plaintiffs filed an opposition, and the defendants filed a reply. (Opposition, ECF No. 62;

United States District Court
Northern District of California

1   Reply, ECF No. 63.) The court held a hearing on the motion on July 30, 2015. (7/30/2015 Minute

2   Order, ECF No. 70.)

3                                    **ANALYSIS**

4   **I. LEGAL STANDARD**

5       Federal Rule of Civil Procedure 8(a) requires that a complaint contain a "short and plain

6   statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A

7   complaint must therefore provide a defendant with "fair notice" of the claims against it and the

8   grounds for relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

9       A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does

10  not contain enough facts to state a claim to relief that is plausible on its face. *See Twombly*, 550

11  U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows

12  the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

13  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a

14  'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

15  unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule

16  12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

17  provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and

18  a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be

19  enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal

20  citations and parentheticals omitted).

21      In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true

22  and construe them in the light most favorable to the plaintiff. *See id.* at 550; *Erickson v. Pardus*,

23  551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).

24      If the court dismisses the complaint, it should grant leave to amend even if no request to

25  amend is made "unless it determines that the pleading could not possibly be cured by the

26  allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (internal quotation

27  marks omitted). But when a party repeatedly fails to cure deficiencies, the court may order

28  dismissal without leave to amend. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992)

*United States District Court*
*Northern District of California*

ORDER (No. 15-cv-01729-LB)

6

(affirming dismissal with prejudice where district court had instructed pro se plaintiff regarding deficiencies in prior order dismissing claim with leave to amend).

## II. APPLICATION

### A. VIRAG's Right of Publicity Claim

In claim one, the plaintiffs allege that the defendants violated VIRAG's common law right of publicity. (FAC, ECF No. 57 ¶¶ 41-46.) The defendants argue that this claim must be dismissed with prejudice because a corporation does not have a right of publicity under California law. (Motion, ECF No. 59 at 15-19.) The court agrees with the defendants.

"California has long recognized a common law right of privacy, which provides protection against four distinct categories of invasion." *Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 416 (Cal. Ct. App. 1983) (footnote and internal citations omitted). "These four distinct torts identified by Dean Prosser and grouped under the privacy rubric are: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness." *Id.* (footnote omitted). It is from the fourth distinct tort—appropriation, for the defendant's advantage, of the plaintiff's name or likeness—that California's right of publicity is derived. *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 391 & n.2 (Cal. 2001); *see Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (discussing the appellants' right of publicity claims and noting that "California has long recognized a common law right of privacy for protection of a person's name and likeness against appropriation by others for their advantage").

"The right of publicity is the inherent right of every human being to control the commercial use of his or her identity." J. Thomas McCarthy, 5 McCarthy on Trademarks and Unfair Competition § 28:1 (4th ed. 2015); *see Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 n.6 (9th Cir. 2006) (quoting this statement from Professor McCarthy). "This legal right is infringed by unpermitted use which will likely damage the commercial value of this inherent right of human identity and which is not immunized by principles of free speech and free press." J. Thomas

United States District Court
Northern District of California

McCarthy, 5 McCarthy on Trademarks and Unfair Competition § 28:1 (4th ed. 2015).

The plaintiffs assert that VIRAG, the corporation, has a right of publicity. The applicable legal authority does not support this.

First, no court has held or even suggested that the right of publicity extends to non-human beings. The few courts faced with this argument have rejected it. *See Eagle's Eye, Inc. v. Ambler Fashion Shop, Inc.*, 627 F. Supp. 856, 862 (E.D. Pa. 1985) (noting that the right of publicity belongs to an individual, declining to extend the right of publicity to a corporation, and dismissing the corporate plaintiff's right of publicity claim for this reason); *Bear Foot, Inc. v. Chandler*, 965 S.W.2d 386, 389 (Mo. Ct. App. 1998) (stating that "[w]hile some states have recognized a right of publicity in individuals or the deceased, we do not believe that a corporation  has such as right" because "[t]he right of publicity creates a cause of action only for misappropriation of a person's likeness" and affirming the trial court's dismissal of the corporate plaintiff's right of publicity claim).

Second, Professor McCarthy has persuasively argued against extending the right of publicity to corporations. *See* J. Thomas McCarthy, 1 Rights of Publicity and Privacy § 4:45 (2d ed. 2015) (commenting that "there should not be a right of publicity for the identity of non-human 'persons'"); J. Thomas McCarthy, 5 McCarthy on Trademarks and Unfair Competition § 28:10 (4th ed. 2015) ("Unlike trademarks, which are usually owned by some form of business entity, non-human business entities have no rights of privacy or publicity. Neither a corporation nor any other form of business organization has a right of privacy or publicity. Those rights were specifically created for real, flesh and blood human persons, not for entities artificially treated as legalistic 'persons.'").

The plaintiffs cite several opinions where courts have either determined or assumed that a group of human beings has a right of publicity as a group. *See No Doubt v. Activision Publ'g, Inc.*, 702 F. Supp. 2d 1139, 1140, 1146-47 (C.D. Cal. 2010) (concluding that "music group" No Doubt's right of publicity claim was not preempted by the Copyright Act); *Apple Corps Ltd. v. Button Master, P.C.P., Inc.*, No. CIV. A. 96-5470, 1998 WL 126935, at *13 (E.D. Pa. Mar. 19, 1998) ("Musical groups as well as individual performers have protectable rights of publicity.");

United States District Court
Northern District of California

8

*Apple Corps Ltd. v. A.D.P.R., Inc.*, 843 F. Supp. 342, 348 (M.D. Tenn. 1993) ("Certainly, the stage name of a group of individuals is entitled to the same protection as the name of one of the individuals which compose that group."); *Brockum Co. a Div. of Krimson Corp. v. Blaylock*, 729 F. Supp. 438, 446 (E.D. Pa. 1990) ("A musical group, as well as an individual performer, has a protectable right of publicity."); *Bi-Rite Enters., Inc. v. Button Master*, 555 F. Supp. 1188, 1199 (S.D.N.Y. 1983) ("A group [of human beings] that develops market value in its persona should be as entitled as an individual to publicity rights in its name[, . . . as] [t]he rationale for protecting the right to publicity does not justify treating similarly situated plaintiffs differently merely because one is an individual and one is a group member."); *Winterland Concessions Co. v. Creative Screen Design, Ltd.*, No. 80 C 5389, 1981 WL 59411, at *4 (N.D. Ill. 1981) (assuming that "entertainers and musical groups" had rights of publicity).

These opinions do not, however, hold or suggest that the right of publicity extends to corporations. To the extent that a corporate plaintiff in these opinions was allowed to assert the right of publicity of a human being or group of human beings, the corporate plaintiff was allowed to do so because a human being or group of human beings transferred or assigned his or their right of publicity to the corporate plaintiff. *See No Doubt*, 702 F. Supp. 2d at 1140 (the music group No Doubt licensed to the corporate defendant a specific, limited, and restricted use of No Doubt's name, likeness, and musical works); *Apple Corps*, 1998 WL 126935, at * 14 ("There is no genuine issue of material fact as to whether Apple owns the right of publicity in the name and likeness of The Beatles. By letter agreements, all four members of The Beatles assigned to Apple their rights in the name and trademark 'The Beatles,' as well as their rights in their likeness 'as Beatles.' Apple is therefore the exclusive owner of the right of publicity.") (internal citation omitted); *A.D.P.R.*, 843 F. Supp. at 344 ("[The corporate] Plaintiff is the owner of the rights of publicity, trade names and trademarks at common law of The Beatles music group and of its former members individually. [The corporate] Plaintiff is solely authorized to exploit the unique elements and features of The Beatles."); *Brockum*, 729 F. Supp. at 446 ("The right of publicity may be legally and validly transferred from an entertainer or musical group to a corporate third-party licensee such as plaintiff Brockum. Prior to the date of the hearing, plaintiff Brockum had been

granted an exclusive license to print the name 'The Rolling Stones' on its T-shirts.") (internal citation omitted); *Bi-Rite Enters.*, 555 F. Supp. at 1199-1200 ("Plaintiff Bi-Rite, as the exclusive licensee of various rock groups, may also assert [a right of publicity] claim" because "[h]olders of exclusive licenses gain standing to protect their interests against all who would encroach on the exclusive rights embodied in the licenses"); *Winterland Concessions*, 1981 WL 59411, at *4 ("The Right of Publicity may be and was validly transferred from the plaintiff entertainers and musical groups to plaintiff Winterland Concessions Company. Accordingly, Winterland has standing to bring this action for violation of the Right of Publicity transferred to it.") The plaintiffs do not allege in the First Amended Complaint that any individual or group of individuals has transferred or assigned his or their right of publicity to VIRAG, and they did not say this in their opposition or at the hearing either. The court finds the plaintiffs' cited authorities to be inapposite.

The plaintiffs also argue that VIRAG "personifies" Mirco Virag and that Mirco Virag "is a personification of" VIRAG. (Opposition, ECF No. 62 at 16-17.) They say that when this is the case, Professor McCarthy acknowledges that a corporation has a right of publicity. Professor McCarthy does not say this. To support their argument, the plaintiffs cite section 4:45 of Professor McCarthy's treatise, *The Rights of Publicity and Privacy*. *See* J. Thomas McCarthy, 1 Rights of Publicity and Privacy § 4:45 (2d ed. 2015). Section 4:45 is titled: "Author's comment: there should not be a right of publicity for the identity of non-human 'persons.'" *Id.* The plaintiffs say that Professor McCarthy "concluded that 'if a name, picture or symbol used as a [corporate] mark *also* identifies a real human being,' then 'the right of publicity [should] be brought into play.'" (Opposition, ECF No. 62 at 16 (quoting J. Thomas McCarthy, 1 Rights of Publicity and Privacy § 4:45 (2d ed. 2015)) (alterations in opposition).) The plaintiffs argue that this means that if a mark also identifies (or, using the plaintiffs' term, personifies) a real human being, the right of publicity should be brought into play for the corporate mark holder. (*Id.* at 16-17.) This is not what Professor McCarthy means. The paragraph in which the quoted portions of Professor McCarthy's sentence appear is as follows:

> I oppose stretching the right of publicity to include any indicia beyond those identifying a real human being, living or dead. And thus I oppose the granting of a "right of publicity" to corporate symbols, trademarks and service marks. Only if a

name, picture or symbol used as a mark also identifies a real human being should the right of publicity be brought into play. This includes fictional and cartoon character marks such as Betty Crocker, the Jolly Green Giant and Mickey Mouse. These are fictional entities, not real human beings or even real animals. Whatever exclusive rights one has in such symbols and pictures must be found in the law of trademark and copyright.

J. Thomas McCarthy, 1 Rights of Publicity and Privacy § 4:45 (2d ed. 2015) (footnote omitted). What Professor McCarthy actually says that is that "[o]nly if a name, picture or symbol used as a mark also identifies a real human being should the right of publicity be brought into play" for that real human being. A real human being may be identified by a mark, and if that is so then that real human being's right of publicity might be implicated, but this does not mean that a corporate mark holder has a right of publicity.

For the reasons stated above, the court dismisses claim one with prejudice.

**B. Mirco Virag's Right of Publicity**

In claim four, the plaintiffs allege that the defendants violated Mirco Virag's common law right of publicity. (FAC, ECF No. 57 ¶¶ 41-46.) Mirco Virag is a human being, so he has a right of publicity. The defendants argue that the plaintiffs have not sufficiently alleged that they violated it. (Motion, ECF No. 59 at 19-20.) The court does not agree.

In California, a plaintiff may plead a claim for violation of the common-law right of publicity by alleging: (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. *Eastwood*, 149 Cal. App. 3d at 416; *see Downing*, 265 F.3d at 1001; *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 793 (Cal. Ct. App. 1995). The court in *Eastwood* did not hold that the right of publicity claim could be pleaded *only* by alleging an appropriation of name or likeness. *See White v. Samsung Elec. Am., Inc.*, 971 F.2d 1395, 1397 (9th Cir. 1992). Instead, it held only that the right of publicity claim *may be* pleaded by alleging, among other things, appropriation of name or likeness. *See id.* This is because it is possible for a plaintiff's identity to be appropriated without the use of the plaintiff's name or likeness. *See id.* at 1397-99 (citing examples). Thus, "[i]t is not important *how* the defendant has appropriated the plaintiff's identity, but *whether* the defendant has done so." *Id.* at 1398 (italics in original).

The defendants do not deny this. They simply argue that the plaintiffs have not alleged any

11

United States District Court
Northern District of California

facts to show that they appropriated Mirco Virag's identity. They point out that the plaintiffs do not allege that Mirco Virag's name or likeness appears in Gran Turismo 5 or Gran Turismo 6 or that a car purportedly being driven by Mirco Virag or featuring the VIRAG® mark appears in either game. Instead, what appears in the games is a bridge over the Monza track which features the VIRAG® mark. The defendants then argue that the plaintiffs do not allege that Mirco Virag uses the VIRAG® mark to refer to himself or that the VIRAG® mark identifies Mirco Virag. On the contrary, the defendants say the plaintiffs allege that VIRAG has become a recognized leader in flooring products and its VIRAG® mark has become well-known in the flooring industry and has become affiliated with the Rally of Monza and the Monza Track in the minds of the public. (*See* FAC, ECF No. 57 ¶¶ 12, 14.)

The plaintiffs respond that they allege that the defendants used Mirco Virag's name—in the form of the VIRAG® mark—in the games. (Opposition, ECF No. 62 at 18.) But simply using the last name of an individual does not violate an individual's right of publicity. As *White* makes clear, the inquiry is whether an individual's identity was misappropriated. *See White*, 971 F.2d at 1397-99.

But the plaintiffs allege more. They allege that Mirco Virag has been racing in the European Rally Circuit since 2001 and, when marketing its tile products, VIRAG sends event invitations to clients capitalizing on Mirco Virag and his racing team's successes. (FAC, ECF No. 57 ¶¶ 19, 20.) They also allege that VIRAG has photographed, published, and distributed limited editions of VIRAG's racing book VIRAG Vincenti Sempre ("VIRAG Always Winning") to select clients, architects, and builders in order to capitalize upon the duality of Mirco Virag's management of VIRAG and his participation in road rallies. (*Id.* ¶ 21.) In short, they allege that, in the international racing world, the VIRAG® mark has become a "personification" of Mirco Virag. (*Id.* ¶¶ 13, 19.)

The defendants argue that this still isn't enough. The court disagrees, at least at this stage of the action. As discussed above, Professor McCarthy acknowledges that a human being's right of publicity can "be brought into play" if a name used as a mark also identifies that human being. J. Thomas McCarthy, 1 Rights of Publicity and Privacy § 4:45 (2d ed. 2015).

United States District Court
Northern District of California

United States District Court
Northern District of California

1       It is a fair observation that the allegations about Mirco Virag appear to be different than the

2   hallmark cases where appellate courts found a celebrity's identity was or could be found to have

3   been appropriated even though the defendant did not use the celebrity's name or likeness. *See*

4   *White*, 971 F.2d at 1399 (in the defendants' so-called "Vanna White" ad, a female-shaped robot

5   wore a long gown, blond wig, and large jewelry and turned a block letter on a game board while

6   standing on what appeared to be the Wheel of Fortune game show set); *Midler v. Ford Motor Co.*,

7   849 F.2d 460, 463-64 (9th Cir. 1988) (the defendants used a Bette Midler sound-alike in an ad to

8   perform one of Bette Midler's popular songs); *Carson v. Here's Johnny Portable Toilets, Inc.*, 698

9   F.2d 831, 835-37 (6th Cir. 1983) (the defendant marketed portable toilets under the brand name

10  "Here's Johnny," which was host Johnny Carson's signature introduction on The Tonight Show);

11  *Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821, 827 (9th Cir. 1974) (the defendants'

12  ad featured a red race car with distinctive white pin-striping and an oval medallion with a white

13  background that was exclusive to the car driven by racer Lothar Motschenbacher). Nonetheless,

14  the court believes Mirco Virag's allegations connecting his identity to the VIRAG® mark are

15  sufficient to defeat the defendants' motion to dismiss, especially given that the court must accept

16  the plaintiffs' allegations as true and construe them in the light most favorable to the plaintiffs.

17      **C. VIRAG's Trademark Infringement and False Designation of Origin Claims under**

18         **the Lanham Act**

19      In claim two, the plaintiffs allege that the defendants infringed the VIRAG® mark in violation

20  of 15 U.S.C. § 1114, and in claim three, the plaintiffs allege that the defendants falsely designated

21  the origin of Gran Turismo 5 and Gran Turismo 6 in violation of 15 U.S.C. § 1125(a). (FAC, ECF

22  No. 57 ¶¶ 47-60.) The defendants argue that these claims fail as a matter of law because their use

23  of the VIRAG® mark is protected by the First Amendment. The court agrees.

24      The Supreme Court has held that "video games qualify for First Amendment protection."

25  *Brown v. Entm't Merchants Assoc.*, 131 S. Ct. 2729, 2733 (2011). It explained:

26         The Free Speech Clause exists principally to protect discourse on public matters,
           but we have long recognized that it is difficult to distinguish politics from
27         entertainment, and dangerous to try. "Everyone is familiar with instances of
           propaganda through fiction. What is one man's amusement, teaches another's
28         doctrine." *Winters v. New York*, 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840

(1948). Like the protected books, plays, and movies that preceded them, video games communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world). That suffices to confer First Amendment protection.

*Id.*; *see Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1241 (9th Cir. 2013) (applying First Amendment protection to a video game). And the Ninth Circuit has recognized the "evolution in recent years toward greater First Amendment protection" for expressive works. *Elec. Arts*, 724 F.3d at 1241 n.3.

Under *Brown*, Gran Turismo 5 and Gran Turismo 6 are expressive works that qualify for First Amendment protection. *See Brown*, 131 S. Ct. at 2733. The plaintiffs argue otherwise, but the court is not persuaded. The plaintiffs say that Gran Turismo 5 and Gran Turismo 6 have "no plot, no characters, no dialog, and no meaningful interaction between the game player and the virtual world." (Opposition, ECF No. 62 at 19.) Instead, Gran Turismo 5 and Gran Turismo 6 each are "marketed as a 'Real Driving Simulator," and "merely allow[] a player to 'drive' a simulated car around preset race tracks" as found by the defendants. (*Id.*)

The court does not believe this is an accurate characterization of the games. Gran Turismo 5 and Gran Turismo 6 have characters (the race car drivers), plot (the drama of the races), and music. And there certainly is meaningful interaction between the game player and the virtual world: how else would a game player play the games? By *not* interacting with them? As the Ninth Circuit has quipped, "[e]ven if [a sports video game] is not the expressive equal of Anna Karenina or Citizen Kane, the Supreme Court has answered with an emphatic 'yes' when faced with the question of whether video games deserve the same protection as more traditional forms of expression." *Elec. Arts*, 724 F.3d at 1241. Indeed, in *Brown v. Electronic Arts, Inc.* the Ninth Circuit found Madden NFL video games that were presented as realistic simulations of American football games to be expressive works. *Id.* It noted that those sports video games featured "characters (players), dialogue (between announcers), plot (both within a particular simulated game and more broadly), and music." *Id.* The court also found "[i]nteraction between the virtual world of the game and individuals playing the game [to be] prevalent." *Id.* The court sees no meaningful difference in the expressiveness of the Madden NFL video games and Gran Turismo 5

14

1    and Gran Turismo 6. They all are expressive works that qualify for First Amendment protection.

2        Because Gran Turismo 5 and Gran Turismo 6 are expressive works, the two-pronged test

3    articulated by the Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), and adopted

4    by the Ninth Circuit in *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002), applies.

5    *Elec. Arts*, 724 F.3d at 1241-42; *see E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547

6    F.3d 1095, 1099 (9th Cir. 2008) (although the *Rogers* test traditionally applies to uses of a

7    trademark in the title of an expressive work, it also applies to the use of a trademark in the body of

8    the expressive work). The *Rogers* test, which is a method for balancing the trademark and similar

9    rights against First Amendment rights, requires courts to construe the Lanham Act to apply to

10   expressive works only where the public interest in avoiding consumer confusion outweighs the

11   public interest in free expression. *See Elec. Arts*, 724 F.3d at 1241; *Mattel, Inc. v. Walking*

12   *Mountain Prods.*, 33 F.3d 792, 807 (9th Cir. 2003); *Rogers*, 875 F.2d at 999. To that end, under the

13   *Rogers* test, the Lanham Act should not be applied to expressive works (1) unless the use of the

14   trademark or other identifying material has no artistic relevance to the underlying work

15   whatsoever, or, (2) if it has some artistic relevance, unless the trademark or other identifying

16   material explicitly misleads as to the source or the content of the work. *See Elec. Arts*, 724 F.3d at

17   1242; *Rogers*, 875 F.2d at 999.

18       Citing the Ninth Circuit's opinions in *MCA Records* and *Walking Mountain* as well as three

19   federal district court opinions, the plaintiffs contend that the *Rogers* test does not apply because

20   the VIRAG® mark does not have "such cultural significance" that it has "become an integral part

21   of our vocabulary." (Opposition, ECF No. 62 at 21 (citing *Walking Mountain*, 33 F.3d at 807;

22   *MCA Records*, 296 F.3d at 900; *Warner Bros. Entm't v. Global Asylum, Inc.*, No. CV 12-9547

23   PSG (CWx), 2012 WL 6951315, at *15 (C.D. Cal. Dec. 10, 2012); *Dita, Inc. v. Mendez*, No. CV

24   10-6277 PSG (FMOx), 2010 WL 5140855, at *3 (Dec. 14, 2010); *Rebelution, LLC v. Perez*, 732

25   F. Supp. 2d 883, 887-88 (N.D. Cal. 2010)).) Regardless of the VIRAG® mark's cultural

26   significance, the *Rogers* test is not limited as the plaintiffs contend. Judge Seeborg recently

27   explained why the *Rogers* test applies to cultural icons—such as the Barbie doll at issue in *MCA*

28   *Records*—but is not limited to them:

United States District Court
Northern District of California

> While [*MCA Records*] indeed opined that "with fame comes unwanted attention," and that a trademark owner certainly may not prohibit all reference to his or her mark once it "becomes an integral part of our vocabulary,"—as Barbie has—the fact that Barbie made its way into the global lexicon does not mean every mark must do so in order for its use to be protected by the First Amendment.
>
> [*MCA Records*], rather, stands for the proposition that a trademark owner may not control public discourse whenever the public "imbues his mark with a meaning beyond its source-identifying function"—a far more inclusive standard than the "cultural icon" one [the plaintiff] advocates. 296 F.3d at 900. Moreover, [*MCA Records*] applies this rule not as a threshold limitation to reaching *Rogers*, but rather as part of the analysis under *Rogers*' first prong. Subsequent Ninth Circuit authority affirms this reading.

*Mil-Spec Monkey, Inc. v. Activision Blizzard, Inc.*, 74 F. Supp. 3d 1134, 1140-41 (N.D. Cal. 2014);

*see also Stewart Surfboards, Inc. v. Disney Book Grp., LLC*, No. CV 10-2982 GAF (SSx), 2011

U.S. Dist. LEXIS 155444, at *6-9 (C.D. Cal. May 11, 2011).

The Ninth Circuit opinions confirm this analysis.

In *E.S.S.*, the plaintiff held a trademark for its stripclub in Los Angeles, and it claimed that the defendant infringed its mark by including it in its video game that simulated Los Angeles. 547 F.3d at 1097-98. The Ninth Circuit stated that the *Rogers* test applies to "artistic works"; it made no mention of a "cultural icon" prerequisite to the test's application. *Id.* at 1099. On the contrary, the Ninth Circuit took note that the plaintiff's mark "has little cultural significance," *id.* at 1100, and the plaintiff "concede[d] that the [video game was] artistic and that therefore the *Rogers* test applie[d]," *id.* at 1099-1100.

In *Brown v. Electronic Arts*, the plaintiff, a well-known American football player, claimed that the defendant, a video game maker, used his likeness in its Madden NFL video games in violation of section 43(a) of the Lanham Act. 724 F.3d at 1238-39. The Ninth Circuit stated that "[s]ection 43(a) protects the public's interest in being free from consumer confusion about affiliations and endorsements, but this protection is limited by the First Amendment, particularly if the product involved is an expressive work." *Id.* at 1239. Although the Ninth Circuit acknowledged that the plaintiff was widely regarded as one of the best American football players of all time and achieved success as an entertainer and public servant, *id.* at 1239-40, nowhere did the Ninth Circuit say that the plaintiff was, or that he had to be, a "cultural icon." Instead, it stated that that section 43(a) "will not be applied to expressive works" if the *Rogers* test is met, *id.* at 1239, and it then applied

the *Rogers* test, *id.* at 1242-47.

Similarly, *Walking Mountain* does not say that the *Rogers* test applies only when a "cultural icon" is involved. The Ninth Circuit observed in *Walking Mountain* that it recognized in *MCA Records* that "when marks 'transcend their identifying purpose' and 'enter public discourse and become an integral part of our vocabulary,' they 'assume[ ] a role outside the bounds of trademark law.'" *Walking Mountain*, 353 F.3d at 807 (quoting *MCA Records*, 296 F.3d at 900). And "[w]here a mark assumes such cultural significance, First Amendment protections come into play," and "'the trademark owner does not have the right to control public discourse whenever the public imbues his mark with a meaning beyond its source-identifying function.'" *Id.* (quoting *MCA Records*, 296 F.3d at 900). But this principle does not preclude the application of the *Rogers* test to marks that are not cultural icons. In fact, later in the opinion, when discussing the *Rogers* test, the Ninth Circuit did not discuss cultural significance. Instead, it simply stated that the *Rogers* test requires courts to construe the Lanham Act to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. *Id.*

As for the district court opinions the plaintiffs cite, *Warner Bros.* and *Dita* simply follow *Rebelution. See Warner Bros.*, 2012 WL 6951315, at *15; *Dita*, 2010 WL 5140855, at *3. The court in *Rebelution* read *MCA Records* and *Walking Mountain* as "plac[ing] an important threshold limitation upon" the application of the *Rogers* test, namely that a "plaintiff's mark must be of such cultural significance that it has become an integral part of the public's vocabulary." *Rebelution*, 732 F. Supp. 2d at 887. But as the court explained above, *MCA Records* and *Walking Mountain* do not establish such a limitation, and *E.S.S.* and *Electronic Arts* do not apply one. The court follows the authority reaching this conclusion. *See Mil-Spec Monkey*, 74 F. Supp. 3d at 1140 & n.4 (describing *Rebelution* as an "outlier decision"); *Stewart Surfboards*, 2011 U.S. Dist. LEXIS 155444, at *5, *8, *11 (finding *Rebelution*'s reasoning not persuasive).

The plaintiffs also contend that the *Rogers* test "is procedurally inapplicable at the motion to dismiss stage." (Opposition, ECF No. 62 at 23.) Many courts apply the *Rogers* test at the summary-judgment stage, but others apply it on a motion to dismiss. The most notable of these is *Electronic Arts*. There, the district court reviewed the Madden NFL video games at issue because

the plaintiff had incorporated them by reference into his complaint. *Elec. Arts*, 724 F.3d at 1248. After doing so, the district court concluded as a matter of law that the plaintiffs' likeness was artistically relevant to the games (the first prong of the *Rogers* test), which aimed to recreate NFL football games. *Id.* The Ninth Circuit affirmed that conclusion based on the district court's review of the game. *Id.* Also, the plaintiff never alleged in his complaint that the defendant explicitly misled consumers about his involvement with the games (the second prong of the *Rogers* test). *Id.* The Ninth Circuit concluded that there was "no problem with the district court deciding this issue [the second prong of the *Rogers* test] in response to a motion to dismiss." *Id.*

The situation is the same here. As noted above in Footnote 2, the court can consider Gran Turismo 5 and Gran Turismo 6 under the incorporation-by-reference doctrine. *See id.* at n.7 (citing *Knievel*, 393 F.3d at 1076). The court thus is able to conclude that the defendants' use of the VIRAG® mark has some artistic relevance to Gran Turismo 5 and Gran Turismo 6 and that the plaintiffs do not allege that the defendants explicitly misled consumers as to the source or the content of the games. The court may apply the *Rogers* test now.

Under the first prong of the *Rogers* test, the court examines whether the use of the trademark or other identifying material has no artistic relevance to the underlying work whatsoever. *See Elec. Arts*, 724 F.3d at 1242; *Rogers*, 875 F.2d at 999. "[O]nly the use of a trademark with *no* artistic relevance to the underlying work *whatsoever* does not merit First Amendment protection." *E.S.S.*, 547 F.3d 1100 (quotation omitted; italics in original). "In other words, the level of relevance merely must be above zero." *Id.* "This black-and-white rule has the benefit of limiting [a court's] need to engage in artistic analysis in this context." *Elec. Arts*, 724 F.3d at 1243 (footnote omitted).

Based on the plaintiffs' allegations and Gran Turismo 5 and Gran Turismo 6 in their entirety, the court finds that the defendants' use of the VIRAG® mark has at least some artistic relevance to Gran Turismo 5 and Gran Turismo 6. In their First Amended Complaint, the plaintiffs allege that Gran Turismo 5 and Gran Turismo 6 claim to simulate car racing in Europe and that the defendants have received millions of dollars in revenue in part from characterizing Gran Turismo 5 and Gran Turismo 6 as "real driving simulator[s]." (FAC, ECF No. 57 ¶¶ 35, 44, 64.) They also allege that Gran Turismo 5 and Gran Turismo 6 include a simulated version of a bridge over the

Monza Track that features the VIRAG® mark. (*Id.* ¶¶ 15-16, 25, 28.) Gran Turismo 5 and Gran Turismo 6 also have been incorporated by reference in their entirety, and the court can confirm that the games seek to provide a realistic simulation of European car racing, including by allowing players to drive on realistic simulations of European race tracks (like the Monza Track). The record is sufficient to allow the court to conclude that, given the central role of realism to Gran Turismo 5 and Gran Turismo 6, the defendants' use of the VIRAG® mark has at least some (i.e., more than zero) artistic relevance to the games. *See Elec. Arts*, 724 F.3d at 1243 ("Given the acknowledged centrality of realism to [the defendant's] expressive goal, and the importance of including [the plaintiff's] likeness to realistically recreate one of the teams in the game, it is obvious that [the plaintiff's] likeness has at least some artistic relevance to [the defendant's] work."); *Novalogic, Inc. v. Activision Blizzard*, 41 F. Supp. 3d 885, 900-01 (C.D. Cal. 2013) ("after evaluating [the video game] as a whole" the district court concluded that the defendant's use of the plaintiff's marks "easily met the artistic relevance requirement under *Rogers*" because their use was "not wholly unrelated to the content" of the video games, as the marks gave the game players "a sense of a particularized reality of being part of an actual elite special forces operation and serve as a means to increase specific realism of the game" and "satisfy[ied] the ever increasing demand for 'authentic simulation' in video games"); s*ee also Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1278-79 (11th Cir. 2012) ("The depiction of the [plaintiff's football team's] uniforms in the content of these items is artistically relevant to the expressive underlying works because the uniforms' colors and designs are needed for a realistic portrayal of famous scenes from Alabama football history.").

The plaintiffs argue that the court cannot determine whether the use of the VIRAG® mark has artistic relevance before discovery is conducted because the "artistic relationship" between the VIRAG® mark and Gran Turismo 5 and Gran Turismo 6 is "not obvious" and it might turn out that the defendants used the VIRAG® mark for commercial gain. (Opposition, ECF No. 62 at 25-26.) This argument is not persuasive. Under the first prong of the *Rogers* test, the court does not need to determine *exactly* how artistically relevant the VIRAG® mark is to the games; it merely has to be able to conclude that the artistic relevance is "above zero." *E.S.S.*, 547 F.3d 1100.

19

Indeed, avoiding the problem the plaintiffs raise is the reason for this "black-and-white rule." *Elec. Arts*, 724 F.3d at 1243. Moreover, whether the defendants used the VIRAG® mark for commercial gain *in addition to* using it for artistic purposes is irrelevant; the inquiry simply is whether the use of the VIRAG® mark has any artistic relevance to Gran Turismo 5 and Gran Turismo 6, period. *Rogers*, 875 F.2d at 999. The court has found that it does.

Under the second prong of the *Rogers* test, "[e]ven if the use of a trademark or other identifying material is artistically relevant to the expressive work, the creator of the expressive work can be subject to a Lanham Act claim if the creator uses the mark or material to 'explicitly mislead[ ] [consumers] as to the source or the content of the work.'" *Elec. Arts*, 724 F.3d at 1245 (quoting *Rogers*, 875 F.2d at 999) (alterations in original). "It is key here that the creator must *explicitly* mislead consumers." *Id.* (italics in original). "This second prong of the *Rogers* test 'points directly at the purpose of trademark law, namely to avoid confusion in the marketplace by allowing a trademark owner to prevent others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner.'" *Id.* (quoting *E.S.S.*, 547 F.3d at 1100). Thus, a court "must ask 'whether the [use of the VIRAG® mark] would confuse [Gran Turismo 5 or Gran Turismo 6] players into thinking that [VIRAG] is somehow behind [the games] or that [it] sponsors [the defendants'] product," *id.* (quoting E.S.S., 547 F.3d at 1100), "*and whether there was an 'explicit indication,' 'overt claim,' or 'explicit misstatement' that caused such consumer confusion*," *id.* (quoting *Rogers*, 875 F.2d at 1001) (italics added). "[T]he mere use of a trademark alone cannot suffice to make such use explicitly misleading," *E.S.S.*, 547 F.3d at 1100; to allow otherwise "would render *Rogers* a nullity," *MCA Records*, 296 F.3d at 902.

Considering the plaintiffs' allegations and Gran Turismo 5 and Gran Turismo 6 in their entirety, there is no plausible support for the conclusion that the defendants used the VIRAG® mark to explicitly mislead consumers as to the source or content of Gran Turismo 5 or Gran Turismo 6. The plaintiffs do not allege or even suggest that the defendants explicitly indicated, claimed, or misstated that VIRAG was a source of content for Gran Turismo 5 or Gran Turismo 6 or sponsored Gran Turismo 5 or Gran Turismo 6. The plaintiffs point out in their opposition that they alleged that, given their involvement in the European racing scene, consumers could think

that they provided expertise and knowledge for the games or sponsored them. (Opposition, ECF No. 62 at 27-28; *see* FAC, ECF No. 57 ¶¶ 29-31, 33, 54, 58.) This does not suffice. The focus of the second prong of the *Rogers* test is on whether the defendants explicitly mislead consumers as to the source or content of the work. The plaintiffs allege only that the defendants used the VIRAG® mark. *See Elec. Arts*, 724 F.3d at 1246 ("To be relevant, evidence must relate to the nature of the behavior of the identifying material's user, not the impact of the use."). The mere use of a mark is not explicitly misleading, *E.S.S.*, 547 F.3d at 1100, even if combined with consumer confusion, *Elec. Arts*, 724 F.3d at 1245-46 (rejecting the plaintiff's argument that the second prong of the *Rogers* test can be satisfied by a defendant's use of the plaintiff's likeness and consumer surveys showing that consumers actually are confused).

The plaintiffs also rely on *Electronic Arts, Inc. v. Textron Inc.* to argue that the defendants' use of the VIRAG® mark alone can satisfy the second prong of the *Rogers* test. *See* No. C 12-00118 WHA, 2012 WL 3042668 (N.D. Cal. July 25, 2012). *Textron* does not change the conclusion. First, *Textron* was decided before the Ninth Circuit decided *Brown v. Electronic Arts, Inc.* In *Electronic Arts*, the Ninth Circuit drove home the point that a defendant must give an "*explicit* indication" or make an "*overt* claim" or "*explicit* misstatement" that causes consumer confusion. 724 F.3d at 1245; *id.* ("It is key here that the creator must *explicitly* mislead consumers.") (italics in original). Second, in *Textron*, the counter-claimant was the intellectual-property holding company of Bell Helicopter. 2012 WL 3042668, at *1. The counter-defendant developed and published a video game that was a "realistic first-person military combat simulation that depicts weapons and vehicles used by the United States military, including the Bell-manufactured AH–1Z, UH–1Y, and V–22 helicopters." *Id.* The district court determined the counter-claimant's Lanham Act claims could not be dismissed under *Rogers* because, in addition to alleging that the counter-defendant used the counter-claimant's marks and trade dress, the counter-claimants alleged that the helicopters were a main selling point for the game and the counter-defendant intended consumer confusion. *Id.* at 5. This was sufficient to plausibly allege a claim. Here, by contrast, Gran Turismo 5 and Gran Turismo 6 are racing games and do not involve any products VIRAG makes, and the VIRAG® mark is on a bridge over a track and not on a car. The

United States District Court
Northern District of California

1    defendants' use of the VIRAG® mark comes nowhere close to an explicit misstatement as to

2    source or content.

3        In sum, the court concludes that, under the *Rogers* test, the Lanham Act does not apply to the

4    defendants' expressive works, Gran Turismo 5 and Gran Turismo 6. The court dismisses claims

5    two and three with prejudice.

6        **D.  The Plaintiffs' Requests for Punitive Damages**

7        The defendants move to dismiss Mirco Virag's claim for punitive damages with respect to

8    claim four. (Motion, ECF No. 59 at 26-28.) (The defendants' other damages arguments are moot

9    because the court dismissed claims one, two, and three with prejudice.)

10       California Civil Code section 3294 authorizes punitive damages against a tortfeasor who has

11   acted with "oppression, fraud, or malice." Cal. Civ. Code § 3294(a). "Malice" is "conduct which is

12   intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on

13   by the defendant with a willful and conscious disregard of the rights or safety of others." *Id.* §

14   3294(c)(1). "Oppression" is "despicable conduct that subjects a person to cruel and unjust

15   hardship in conscious disregard of that person's rights." *Id.* § 3294(c)(2). And "fraud" "means an

16   intentional misrepresentation, deceit, or concealment of a material fact known to the defendant

17   with the intention on the part of the defendant of thereby depriving a person of property or legal

18   rights or otherwise causing injury." *Id.* § 3294(c)(3).

19       Section 3294 is the substantive standard, but in federal court a plaintiff need not allege facts

20   supporting the punitive damages claim with particularity. *Tamburri v. Suntrust Mortg., Inc.*, No.

21   C–11–2899 EMC, 2012 WL 3582924, at *3 (N.D. Cal. Aug. 20, 2012); *Taheny v. Wells Fargo

22   Bank, N.A.*, No. CIV. S-10-2123 WKK/EFB, 2011 WL 1466944, at *4 (E.D. Cal. Apr. 18, 2011)

23   ("Although Section 3294 provides the governing substantive law for punitive damages,

24   California's heightened pleading standard irreconcilably conflicts with Rules 8 and 9 of the

25   Federal Rules of Civil Procedure—the provisions governing the adequacy of pleadings in federal

26   court.") (quoting Cl*ark v. Allstate Ins. Co.*, 106 F. Supp. 2d 1016, 1018 (S.D. Cal. 2000)). Thus,

27   "in federal court, a plaintiff may include a "short and plain" prayer for punitive damages that relies

28   entirely on unsupported and conclusory averments of malice or fraudulent intent." *Clark*, 106 F.

United States District Court
Northern District of California

Supp. 2d at 1019; *see also Somera v. Indymac Fed. Bank, FSB*, No. 2:09-cv-01947-FCD-DAD, 2010 WL 761221, at *10 (E.D. Cal. Mar. 3, 2010) ("Under federal pleading standards, defendant's argument that plaintiff must plead specific facts to support allegations for punitive damages is without merit."); *but see Kelley v. Corr. Corp. of Am.*, 750 F. Supp. 2d 1132, 1147 (E.D. Cal. 2010) (rejecting conclusory allegations of malice, fraud, or oppression as not reflecting new pleading requirements under *Twombly* and *Iqbal*).

The defendants concede that the plaintiffs did not need to allege facts. Instead, they argue that the plaintiffs' punitive damages request fails because they did not specifically allege that they acted with "oppression, fraud, or malice" as required under section 3294(a). The plaintiffs did not use the words "oppression, fraud, or malice" in the First Amended Complaint, but they did allege that the defendants intentionally and without authorization chose to incorporate the VIRAG® mark to create a false impression of sponsorship or authorization. (FAC, ECF No. 57 ¶ 31.) The plaintiffs also alleged that the defendants obtained licenses or authorization from other trademark holders to use their marks in Gran Turismo 5 and Gran Turismo 6, but the defendants did not obtain a license or authorization from VIRAG or Mirco Virag. (*Id.* ¶ 32.) The court thinks that the plaintiffs' allegations of intentional conduct falls within the definition of "malice," that is, "conduct which is intended by the defendant to cause injury to the plaintiff." Cal. Civ. Code § 3294(c)(1). The defendants' cited opinions do not hold that a plaintiff is required to use the words "oppression, fraud, or malice." The court thus denies the defendants' motion to dismiss Mirco Virag's request for punitive damages for claim four.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## CONCLUSION

The court grants in part and denies in part the defendants' motion to dismiss the plaintiffs' First Amended Complaint. The court dismisses claims one, two, and three with prejudice. In doing so, the court finds that the claims cannot be saved by amendment. *See Lopez*, 203 F.3d at 1127. Claim four survives.

**IT IS SO ORDERED.**

Dated: August 21, 2015

_____

LAUREL BEELER
United States Magistrate Judge